OPINION
Anjuan Henry appeals from his conviction of two counts of offering to sell cocaine in an amount greater than 5 grams but less than ten grams in violation of R.C. 2925.03(A) and possession of crack cocaine in an amount exceeding 100 grams in violation of R.C. 2925.11.
On June 3, 1999, Henry was arrested along with Terrence Martin for the possession of 142 grams of crack cocaine. The arrest occurred shortly after Trooper C.A. Miller of the Ohio State Highway Patrol encountered Martin's disabled automobile on the side of Interstate 70 outside of Springfield. Trooper Miller recovered a bag of crack cocaine just outside the passenger door of Martin's vehicle in which Henry was the passenger just after Martin reached into the vehicle from the passenger side.
On October 20, 1999, Springfield police officers sent an informant to Henry's residence in Springfield to purchase crack cocaine. The informant was fitted with a wire so that the officers could hear the informant's conversations with Henry. Sergeant Roger Roberts of the Clark County Sheriff's Office monitored the informant's activity and overheard Henry offer to sell the informant a quarter of an ounce of crack cocaine for $300. Roberts provided the informant with the money to make the purchase. (Tr. 263, 264).
On October 22, 1999, Roberts engaged in the same activity with the informant. Roberts again heard the informant purchase a quarter ounce of crack cocaine from Henry for $300. Roberts overheard Henry ask to check the informant for a "wire" as she started to leave Henry's residence. Roberts overheard Henry find the wire on the informant and heard her scream for help. (Tr. 268). Roberts and other officers then rushed into Henry's house where they arrested Henry who was the lone person on the premises. Roberts and the other officers recovered $2,750 in cash in a zipper bag and a $50 bill which matched the recorded currency used by the informant to make her buy on October 20, 1999.
During the trial the informant, Terri Gwaltney, testified about the purchases of crack from Henry but her testimony was ordered stricken by the trial court because of a discovery violation. The tape of the wired conversations was also ordered stricken. (Tr. 322). Detective Rogers' testimony about what he heard on the tape was not ordered stricken however. (Tr. 322).
The cocaine purchased by Gwaltney on October 20 and October 22 was determined to weigh 3.79 grams and 3.70 grams respectively. Detective Joseph Tedeschi testified a quarter ounce of crack cocaine contains approximately seven grams of crack cocaine. (Tr. 353).
Henry was indicted by the Clark County Grand Jury for the drug sale charges on November 11, 1999. On February 10, 2000, the State moved to consolidate the drug charges with the earlier indictment charging the defendant with fleeing and eluding, receiving stolen property, and possession of crack cocaine. On February 28, 2000, the trial court granted the State's motion and set the trial for March 7, 2000.
On March 9, 2000, the trial was continued because numerous defense motions were yet to be resolved. The trial was rescheduled for May 15, 2000.
On the morning of trial the following occurred in open court:
 THE COURT: This is case number 99-CR-0246, State of Ohio versus Anjuan C. Henry.
 Let the record show that this case was set for — first of all, the counsel and his attorney or his client was to have been here at 9:00 a.m. and that the time right now is 25 till 11. Further, that I conversed with the counsel for the Defendant at — at 9:30 and informed counsel for the Defendant that he and his client were to appear.
 At that time the counsel for Defendant informed the Court that he was 30 minutes away and that his client was 40 minutes away, which would have made his client's appearance necessary by 10 after 10 because the Court informed counsel that both of them were to appear forthwith or bond would be forfeited.
 Let the record further show that the Defendant, Anjuan C. Henry, appeared at 10 after 10 as advertised but that counsel for the Defendant — and are you Daniel J. or Daniel L.?
 MR. O'BRIEN: Your Honor, respectfully, Daniel L. O'Brien.
 THE COURT: All right. Let the record show that Daniel L. O'Brien appeared five minutes ago.
 THE COURT: Mr. O'Brien, do you want to tell and give the Court any reason why I should not hold you in contempt of court?
There followed a brief colloquy with counsel and the trial court proceeded to find Mr. O'Brien in contempt for being late for court. Mr. O'Brien then informed the court the circumstances behind his continuance motion:
 MR. O'BRIEN: With all due apologizes to the Court and I apologize for this Court's time.
 Your Honor, if I may, there is going to be, and I respectfully have thought about here that it is quite likely that I am incurring the Court's ire. I apologize to the Court for any upset of the Court. The fact of the matter is that my client, Anjuan Henry, is appearing today at the Court's order and is here as the Court so noted.
 My client over the weekend, relatives informed me on Sunday p.m. that he had been shot through the neck. He had been Life Flighted from Springfield to Dayton, Ohio, where they treated him there. He was subsequently released once the life threatening situation was over.
 He is not himself. In fact, he's appearing here, he is in hospital gown and a neck bandage. I'm told he is taking his neck brace off that's issued from him, that he apparently bleeds through three wounds still and should expect to bleed through the bandages. He is not himself mentally nor properly able to defend himself, that he was shot by an assailant.
 This is not a self-inflicted wound. That apparently he was not involved in any kind of illegal activity on his part, that Springfield police are investigating this matter and I contacted the Court at 8:30 this morning to indicate that in my opinion I can't allow the trial to proceed with my client in this state and that we would ask this Court for a proper continuance, short as may be necessary, to have such time that my client can actively participate in his defense and can properly present himself to any jury on the charges here; and he has previously shown for all court dates, including all the way through the first trial which ended in a hung jury. He has remained under the requirements of his bond; and I'm sure, as the Court is aware, he has not attempted to have anybody shoot him in order to not report for a trial here today.
 Therefore, respectively, I must with all due respect to this Court refuse to put my client on trial and ask this Court for a proper continuance to allow that to go forward. I understand that the Court has indicated that it may revoke his bond if he does not appear for trial, so we have gotten him out of a hospital-type treatment in his home where he has people caring for him and brought him here immediately upon the Court's order.
 Your Honor may not know me personally, but I would not attempt to present any fraud upon the Court or to use this in any manner for a delay were it not necessary. I think the Court's concern about my timeliness indicates that I felt quite secure from the reports of the event that resulted in his shooting, from the reports of his relatives as to his health, from the fact it hasn't been more — it's either within 48 or 72 hours of my client being Life Flighted to another city for emergency treatment.
 I therefore would ask the Court to see its way clear to grant a continuance and that this counsel must respectfully refuse to put this client on trial in front of a jury.
 THE COURT: Well, have you consulted with his, a doctor regarding his present condition?
MR. O'BRIEN: Your Honor, I —
THE COURT: Just takes a yes or no, have you?
MR. O'BRIEN: With a doctor, no, Your Honor.
 THE COURT: Have you consulted with your client here this morning?
 MR. O'BRIEN: Your Honor, I have talked with his relatives and him.
THE COURT: With him, I said yes or no.
 MR. O'BRIEN: Your Honor, to less than a paragraph of talk.
 THE COURT: So the answer is yes, you consulted with him. Is that correct?
MR. O'BRIEN: I have informed him very —
 THE COURT: Excuse me, I don't want to know what the conversation was about. What I want to know is have you consulted with him, just yes or no.
 MR. O'BRIEN: Not in the manner Your Honor is suggesting, no.
 THE COURT: You've had no conversation with him at all; is that correct?
 MR. O'BRIEN: Your Honor, not in any form of a consultation or a legal conversation about —
 THE COURT: Have you had a conversation with him this morning?
 MR. O'BRIEN: With give and take, Your Honor, no. I have asked him if he understood me.
THE COURT: And?
MR. O'BRIEN: And —
THE COURT: And?
MR. O'BRIEN: He nodded his head.
 THE COURT: Nodded his head yes, that he did, in fact, understand you.
 MR. O'BRIEN: That he understood the very short description of why he was here today.
 THE COURT: All right. Then the Court at this time will overrule your motion for a continuance. The Court notes that your client was released and is not hospitalized, was, in fact, at home, and has already had apparently a neck brace taken off of him, according to your statement. While he has a bandage on his neck.
 The only question that I would ask you is do you want the opportunity to dress him in street clothes or do you want to go forward the way you are now?
 MR. O'BRIEN: Your Honor, he appears as he appears because this Court —
THE COURT: Excuse me, which do you want?
 MR. O'BRIEN: I'm attempting to explain, Your Honor, if I may.
 THE COURT: No, I don't need an explanation. I want you tell me which option you want. Do you want to go now, do you want the opportunity to dress him in street clothes? It's up to you.
 MR. O'BRIEN: Begging the Court's permission, Your Honor, I can't answer that quickly.
THE COURT: Well, what do you need to do?
 MR. O'BRIEN: Your Honor has ordered him today to be here in lieu of jail.
 THE COURT: I know what I've ordered him to do. I want to know now what option do you desire to take? You've got one of two options. Do you want to go forward now, immediately, and we'll start, we'll call the jury panel in; or do you want the time to put him in street clothes. That's up to you, one or the other.
 MR. O'BRIEN: Your Honor, I need time to consult with my client.
 THE COURT: Then consult with him. There he is right beside of you.
 MR. O'BRIEN: All right. Your Honor, I would ask this Court for a quick recess in order for me to speak with him within the confines of attorney-client privilege.
 THE COURT: Take him right on back to the back of the courtroom there and you talk to him no problem. No one's going to hear you.
 MR. O'BRIEN: I must respectfully disagree with him, Your Honor, that if I attempt to have an attorney-client privilege conversation in the back of the courtroom that everyone would probably hear me in this room, Your Honor.
THE COURT: Counsel, did you understand plain English?
 MR. O'BRIEN: If that's the Court's decision, we'll abide by it.
THE COURT: It's precisely the Court's decision.
* * *
 (WHEREUPON, a conference was held between Defendant and Defense Counsel out of hearing and off the record.)
* * *
 MR. O'BRIEN: Your Honor, thank you for the time. I've talked with my client. He wishes to attempt to put some clothes on. He's not had street clothes on since that time, and his relatives need a chance to help him get those clothes in order for him to dress.
 THE COURT: All right. So what, you're talking about starting at 1?
 MR. O'BRIEN: Whenever the Court would provide. 1:00 would be a good time for us, Your Honor.
 THE COURT: Well, it's 10 till 11 and you informed me earlier this morning he's 40 minutes away. Is that right?
 MR. O'BRIEN: He can get clothes here in Springfield, Your Honor.
 THE COURT: Oh, fine. Okay. So you're talking about — are you talking about earlier than 1:00?
 MR. O'BRIEN: I'm making a lot of predictions here, Your Honor; but speculating that if Your Honor wanted to go from approximately noontime or 12:30, if you wanted to go that quickly, we might be able to have him back and dressed in that period of time.
 THE COURT: All right. Why don't we say 12:30 then, and I would expect by that time you also deposit the money with the Bailiff of this Court and you, as Bailiff, are directed to pay that into the Clerk of Courts.
All right. Anything further at this time?
(No response.)
THE COURT: We're in recess.
* * *
 MR. O'BRIEN: Real quick, Your Honor, my client has attempted to put a shirt on and it has not worked out for him. He's back in a hospital gown. He's only been ordered as of sometime tonight he's able to take a shower for the first time.
 Obviously we respectfully object to this Court's ruling, but we are here today. I don't know much about the medical process. I've learned some here in about the last half an hour. Your Honor, if Your Honor would note any type of distress on the part of my client, I hope we would allow a quick recess for whatever is occurring to be corrected.
 I am not projecting anything would; but if it does, I will attempt to indicate in a way that would not be too distracting to the jury, I hope.
(WHEREUPON, a recess was taken at 10:50 a.m.)
* * *
 Henry contends in his first two assignments of error that he was denied a fair trial when the trial court denied him a reasonable continuance although he had been shot in the neck on the day before trial and was required to appear in court with a fresh gunshot wound and in a hospital gown. The State did not file a brief in this matter and for the reasons that follow we sustain Henry's first two assignments of error.
A decision to grant or deny a motion for continuance is left to the sound discretion of the trial court. See, State v. Unger (1981),67 Ohio St.2d 65; Hartt v. Munobe (1993), 67 Ohio St.3d 3, 9; MidlandSteel Prods. Co. v. U.A.W. Local 486 (1991), 61 Ohio St.3d 121,130-131. An abuse of discretion connotes more than an error of law; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. See, In re Jane Doe 1 (1991), 57 Ohio St.3d 135, 137;Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
The trial court may balance the potential prejudice to a party against the court's right to control its dockets and the public's interest in the efficient dispatch of justice. Dublin Transp., Inc. v. Goebel, 1999 WP 163208 * 11 (Ohio App. 10 Dist. 1999).
 In reviewing the cases that deal with the propriety of granting or denying a continuance, we note that the divergent factual circumstances that surround these cases renders the creation of a mechanical test both impossible and undesirable. Rather, "`[t]he answer must be found in the circumstances present in every case * * *;" taking into account * * * a balancing * * * of all the competing considerations."
State v. Unger, supra, at 67, quoting in part Ungar v. Sarafite (1964),376 U.S. 575, 589., Appellant argues that it is inconceivable that the trial court failed to grant his request for a continuance when he was shot through the neck and hospitalized on the eve of trial. We agree. "Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend a sense of justice." Frankfurther, J., in Rochin v.California (1952), 342 U.S. 165, 173.
It offends our sense of justice that a defendant facing serious criminal charges and having just been released from a hospital after suffering a serious gunshot wound would be required to proceed to trial in that condition.
The right to a fair trial is fundamental. Estelle v. Williams (1976),425 U.S. 501. In that case, the United States Supreme Court held that the state cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes. The Court reasoned that to force a defendant to appear in that fashion would impair the presumption of innocence while furthering no vital State interest. Id., at 505.
Courts in other jurisdictions have recognized the importance of having a defendant appear at trial in an acceptable physical condition. In Statev. Maisonet (2001), 763 A.2d 1254, the Supreme Court of New Jersey reversed a defendant's drug conviction after a jury trial where the defendant was denied basic necessities while in custody. As a direct result, the defendant appeared dirty and unkempt during most of the trial.
The Court in Maisonet noted that despite his counsel's objections, defendant was compelled to appear at trial in a disheveled state that undoubtedly had the potential to diminish his credibility before the jury. The harm to the defendant was compounded by the fact his defense consisted mainly of his own testimony requiring the jury to assess his truthfulness.
In State v. Spellman (La. 1990), 562 So.2d 455, the Supreme Court of Louisiana reversed a defendant's conviction who appeared in prison clothing in part because the trial court had failed to find that the defendant's attire was "reasonably clean and suitable." The court said that "a defendant may insist he appear before jurors with all the dignity of a free man, presumed innocent until determined otherwise." Ibid.
In this case the trial court made no inquiry of the defendant regarding his physical condition. The court did not determine whether the defendant was in pain from his recent gunshot injury or whether he was taking medication which may have affected his ability to counsel with his lawyer or fully understand his situation.
Undoubtedly, the jury must have wondered how the defendant sustained his gunshot wound and whether it was related to criminal conduct. The appellant's first two assignments of error are sustained.
In his third assignment, Henry contends he was denied a fair trial because the trial court refused to grant his motion to sever his possession of cocaine charge which allegedly occurred in April 1999 from the two sale counts which allegedly occurred in October 1999. Because of the likelihood of re-trial in this matter we will address this assignment of error.
Crim.R. 8 allows for joinder of offenses in the same indictment if the offenses charged are of same or similar character. Joinder of offenses, however, "solely because they are of a same or similar character creates a greater risk of prejudice to the defendant." State v. Schaim, (1992),65 Ohio St.3d at 58. Crim.R. 14 protects a defendant from such risks by allowing severance of the offenses.
To prevail on a claim that the trial court erred in denying a motion to sever, the defendant has the burden of demonstrating three facts: (1) that his rights were prejudiced, (2) that at the time of the motion to sever the trial court was provided with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. State v. Schaim, supra; citing State v. Torres (1981),66 Ohio St.2d 340, syllabus.
"To determine whether a defendant is prejudiced by the joinder of multiple offenses, the trial court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct."State v. Crawford (1999), 135 Ohio App.3d 207, 212, citing State v.Schaim (1992), 65 Ohio St.3d 51.
The possession charge was then joined with two counts of sale resulting from the alleged purchase of crack cocaine from the appellant by Gwaltney in October 1999., Appellant contends the evidence that the defendant possessed cocaine in April was not admissible to prove his guilt of selling cocaine in October 1999 and vice versa. We agree that such evidence was not admissible under Evid. R. 404(B) as proper evidence of other crimes.
The second way that the counts may have been joined without prejudice is whether they were simple and distinct. The object of the "simple and distinct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. State v.Wiles (1991), 59 Ohio St.3d 71; State v. VanSickle (1993),90 Ohio App.3d 301, 306. To assess the validity of this rationale, a court reviews the record "in the light of what actually occurred after the consolidated trials went forward, not merely in terms of what might have been a proper course for the court to have pursued when the motions respecting consolidation were made." Dunaway v. United States (C.A.D.C. 1953), 205 F.2d 23, 25; accord, State v. Schaim, supra (where appellate court confuses evidence adduced at trial, it is impossible to maintain the fiction that the jury was capable of keeping the evidence separate)., Appellant points out that the prosecuting attorney in final argument improperly characterized the two separate incidents as a course of conduct to prove the defendant's guilt on both charges. "Notwithstanding pending charges for possession of that crack cocaine Anjuan Henry takes a chance to sell the same type of substance, crack cocaine" (Tr. 428-29).
In Schaim, supra, Justice Wright discussed why the defendant was prejudiced by the joinder of three different sex offenses at page 62 of the Court's opinion:
 It is evident that the joinder of these counts allowed the jury to consider significant amounts of other acts evidence that would not have been admissible if the charges had been severed for trial. Instead of separate trials that carefully limited the admissibility of other acts evidence, the defendant was subjected to one trial where the jury was permitted to simultaneously consider the evidence of three different offenses. This was particularly prejudicial concerning the defendant's remaining conviction for gross sexual imposition because the evidence supporting this conviction is at best thin. Despite this fact, the state maintains that the defendant was not prejudiced by joinder because the evidence of each crime was so simple and distinct that the jury could segregate the evidence. State v. Roberts (1980), 62 Ohio St.2d 170, 16 O.O.3d 201, 405 N.E.2d 247. However, the court of appeals apparently confused Rhonda and Leisa's testimony when considering the sufficiency of the state's evidence on the gross sexual imposition charge." See Drew v. United States (C.A.D.C. 1964), 331 F.2d 85 (defendant was prejudiced by joinder where the record reflected confusion as to which of the crimes was being referred to).
 Henry was initially tried on the possession charge in February 2000 and the trial resulted in a hung jury. The State's case on the possession charge was not nearly as strong as the evidence on the sale charges. We agree that the jury would have had difficulty keeping the possession and sale incidents separate and would have been inclined to consider the evidence of the sales corroborative of the defendant's guilt on the earlier possession charge. The appellant's third assignment of error is sustained.
In his fourth assignment, Henry contends that he was denied a fair trial because of the misconduct of the prosecutor in final argument. We need not address this assignment due to our disposition of the first two assignments of error.
In his fifth assignment of error Henry contends the trial court erred in denying his acquittal motion made at the conclusion of all the evidence because the evidence was insufficient to prove that he offered to sell the informant an amount of crack cocaine in an amount exceeding five grams but less than ten grams. We disagree. Officer Rogers' testimony and Detective Tedeschi's testimony provided sufficient evidence for the jury to convict Henry of the two trafficking charges in October 1999. This assignment of error is overruled.
In his sixth assignment, Henry contends his convictions were against the manifest weight of the evidence. Unlike the "sufficiency" assignment which prevents retrial, we need not address this assignment of error and we won't.
In his seventh assignment, Henry contends the trial court erred in admitting a note recovered by the police during a search of his house. The note is from an undisclosed person who wishes the recipient of the note well. We agree with Henry that the note bears no relevance to the issues before the court and was not authenticated. The trial court should have denied the note's admission. The seventh assignment of error is sustained.
In his last assignment, Henry contends the cumulative effect of all the errors committed by the trial court denied him a fair trial. We disagree. This assignment of error is overruled.
The judgment of the trial court is Reversed and Remanded for further proceedings consistent with this opinion.
WOLFF, P.J., and FAIN, J., concur.